## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

In re:

**IRVING TANNING COMPANY,**
**PRIME TANNING CO., INC.,**
**PRIME TANNING CORP.,**
**CUDAHY TANNING COMPANY, INC.,**
**WISMO CHEMICAL CORP.,**
**PRIME TANNING COMPANY, INC.,**

        **Debtors.**

**Chapter 11**

**Case No. 10-11757**

**(Jointly Administered)**

**DEVELOPMENT SPECIALISTS, INC.,**
**AS TRUSTEE OF THE IRVING/PRIME**
**CREDITORS' TRUST**

        **Plaintiff/Counterclaim**
        **Defendant.**
**v.**

**MICHAEL W. KAPLAN,**

**et. al.**

        **Defendants/**
        **Counterclaim**
        **Plaintiffs.**

**Adv. Pro. No. 12-1024**

# MEMORANDUM OF DECISION

## I.  Introduction.

This adversary proceeding emerges from the confirmed chapter 11 plan of the jointly

administered cases of six debtors (the "Debtors"): Prime Tanning Company, Inc. ("Prime

Delaware"), Irving Tanning Company ("Irving Tanning"), Prime Tanning Co., Inc. ("Prime

Maine"), Cudahy Tanning Company, Inc. ("Cudahy"), Prime Tanning Corp. ("Prime Missouri")

and Wismo Chemical Corp. ("Wismo"). The Debtors were related.  Prime Delaware was the

parent corporation of Irving Tanning, Prime Maine and Cudahy.  Prime Missouri was a wholly-

owned subsidiary of Prime Maine, and Wismo was a subsidiary of Prime Missouri.  The order

confirming the chapter 11 plan authorized the creation of the Irving/Prime Creditors' Trust and

granted plaintiff Development Specialists, Inc., as the trustee of that trust (the "Trustee"), the

power to pursue various claims arising from the 2007 transfer of Prime Maine's shares (the

"2007 Transaction") and a later release of certain claims connected to that transaction (the "2010

Release").  In 2012, the Trustee commenced this action by filing a multi-count complaint (the

"Complaint") which seeks to avoid the 2007 Transaction and recover damages from the

defendants, jointly and severally, in excess of $23.6 million.

There are two categories of defendants (the "Defendants").  Some are the former

shareholders of Prime Maine: Michael Kaplan, Morris Stephen Kaplan ("Stephen Kaplan"),

Marjory Kaplan, the Glenyce S. Kaplan Lifetime Trust-1994 (the "Lifetime Trust"), the Prime

Tanning Co., Inc. Voting Trust-1994 (the "Voting Trust") and the Estate of Leonard Kaplan (the

"Shareholder Defendants").[1]  Others are the former directors of Prime Maine: Michael Kaplan,

Stephen Kaplan, Glenyce Kaplan, Steven Goldberg, Eliseo Pombo, and Robert Moore (the

"Director Defendants").  Four of the counts of the Complaint maintain that the Shareholder

Defendants' actions in connection with the 2007 Transaction and the 2010 Release constitute

actual fraudulent transfers under Maine's version of the Uniform Fraudulent Transfers Act.

Eight of the counts allege that the Shareholder Defendants' actions constitute constructively

fraudulent transfers under the same act.  The final two counts assert that the Director Defendants

---

[1] The Shareholder Defendants filed a counterclaim requesting a judgment declaring that all of the interest and claims which they relinquished by the 2010 Release be fully reinstated in the event that the Trustee is successful in its claims against them (the "Counterclaim").   All of the Defendants filed a third party complaint ("Third Party Complaint") against Meriturn Partners, LLC ("Meriturn"), Mark Kehaya, Franklin Staley and Lee C. Hanson seeking indemnification and contribution in connection with the Complaint.  The Third Party Complaint was later dismissed.

breached their fiduciary duties of care and loyalty required by the Maine Business Corporation
Act.

After consideration of the evidence, including the testimony of witnesses, the exhibits
offered at trial, the various papers submitted by the parties, and the stipulations of the parties, as
well as the controlling law and the earlier rulings in this adversary proceeding, I conclude that
the Trustee has not met its burden on any of the fourteen counts against the Defendants and
therefore judgment shall enter in their favor.  Doing so moots the relief sought by the
Counterclaim and it shall be dismissed.

**II.  Background.**

The Debtors were in the leather industry business which, for purposes of this case, has
two important segments; leather tanning and leather finishing.   Leather tanning, also known as
"wet bluing", involves dehairing raw cattle hides and then chemically processing them until they
are preserved and turn blue.  Leather finishing takes the wet blued hides to their finished state so
they can be formed into leather goods.  Prime Maine operated a wet blue operation in St. Joseph,
Missouri through its subsidiary Prime Missouri, and a leather finishing operation in Berwick,
Maine.

The Kaplan family (including father Leonard Kaplan, mother Glenyce Kaplan, and their
children Michael Kaplan, Stephen Kaplan and Marjory Kaplan) had a long relationship with the
Prime Maine leather business.  Leonard Kaplan's father initially founded the business in Maine
over 100 years ago, leaving Leonard Kaplan a healthy business upon his death.  Leonard Kaplan
successfully expanded Prime Maine so that it reached a global market. At one point, the Prime
Missouri tannery was one of the largest in the world, and the Prime Maine Berwick finishing
facility was one of the largest in the United States.

After Leonard Kaplan's death in 2006, and prior to the 2007 Transaction, the Shareholder Defendants owned all of the shares of Prime Maine, and Michael Kaplan and Stephen Kaplan became co-chairmen of the board of directors of Prime Maine and Prime Missouri.   During the relevant periods of time for this case, Mr. Goldberg (who was also the Executive Vice President of Prime Maine), Mr. Pombo, Ms. Kaplan and Mr. Moore were also members of the board of directors of Prime Maine.   In addition, Mr. Goldberg and Mr. Moore were members of the board of directors of Prime Missouri, and Mr. Moore was the CEO and president of Prime Maine, Prime Missouri and Prime Delaware.  Mr. Moore also served on the latter's board of directors.

In the years leading up to the 2007 Transaction, the tanning and finishing industry in the United States was in a state of contraction, in part due to foreign competition.  Domestic leather tanning and finishing companies were experiencing pricing pressures, which reduced revenues and profitability.  Revenues within the industry had dropped dramatically since 2000, and the decline was expected to continue.  The Debtors were not immune to this.  While Prime Maine had enjoyed many years of solid profitability, it suffered operating losses in fiscal year 2005 of just under $1 million on overall revenues of $190 million, and it projected losses for fiscal year 2006.   In October of 2006, at the recommendation of Norman Spector, its counsel, Prime Maine retained Phoenix Management Services ("Phoenix"), an on-site management advisory and financial services firm, to assist the shareholders in evaluating courses of action to protect the equity value of their investment and to preserve value for the next generation of the Kaplan family.  Phoenix performed an analysis of Prime Maine and Prime Missouri's financial and operational history and forecasts, and presented its written analysis and recommendations to the Prime Maine board of directors on December 19, 2006 (the "Phoenix Report").  Trustee's Trial Exhibit 12.

The Phoenix Report made a number of observations regarding Prime Maine and the industry:

> Prime Missouri's operations were vulnerable to market pricing pressures, and 30% of its production was sold to a single China-based customer, Shanghai Richina Leather, which had "clearly indicated that if Prime Tanning is not interested in forming a venture aimed towards an IPO, it will move a portion, if not all, of its volume";

> Prime Maine's Berwick facility was operating at below break-even and faced increasing price pressures and decreasing production volume;

> The 2006 net operating cash-flow was positive only as a result of recording a $1.5 million tax benefit, which at that time had not yet been realized;

> Working capital had grown significantly through 2005 as a result of an increase in inventory and receivables;

> Globalization had and would continue to harm domestic manufacturers;

> Domestic revenue had decreased over 18% since 2001 and was expected to decline from $2 billion per year in 2005 to $1.6 billion per year in 2010; and

> Given the company's historical and current financial performance, as well as changes in the industry, customer concentration, and reliance on bank debt to fund operations, Prime Maine should be cautious regarding the fragility of its banking relationship with Bank of America.

The Phoenix Report presented three recommendations to the Prime Maine board: (i) develop and implement a financial turnaround plan; (ii) pursue a venture with an Asian partner; or (iii) divest the business.  Phoenix recommended that a plan to shut down the Berwick plant be developed and implemented immediately.

Coincidentally, also late in December of 2006, Mr. Moore, on behalf of Prime Maine, began communicating with Mark Kehaya of Meriturn about Meriturn's interest in Prime Maine. Meriturn, a private equity firm involved in advising and investing in distressed companies, was familiar with Prime Maine from the due diligence efforts it undertook in 2005 when it acquired Irving Tanning out of bankruptcy.   Mr. Kehaya believed there was an over-capacity in the

production of leather in the United States, and an opportunity to consolidate, cut costs and make

a profit.  He also believed that there was no major international leather supplier, and that by

creating one through a merger of Prime Maine with Irving Tanning, he could reach additional

customers and gain additional markets.   Mr. Moore, as directed by the Prime Maine board, told

Mr. Kehaya that if Meriturn wished to purchase Prime Maine, it would need to establish that it

had the financial capacity to consummate such a deal given that Prime Maine was generating

revenues of $200 million and had a net book value in the mid $40 million range.

Negotiations commenced.  Prior to reaching an agreement on the terms of the 2007

Transaction, Meriturn and Prime Maine exchanged several proposed letters of interest ("LOI").

In the first LOI, Meriturn offered to buy all of the stock of Prime Maine for $26 million in cash,

a $7.5 million seller note, assumption of existing debt of $9.4 million, and exclusion of cash

proceeds and equity of certain life insurance policies valued at $9 million.  This offer of

approximately $42 million to the Shareholder Defendants was generally consistent with Prime

Maine's balance sheet at that time, which showed a net value of about $45 million.  Defendants'

Trial Exhibit 41.  Michael Kaplan and Stephen Kaplan testified that the Shareholder Defendants

rejected that offer because they wanted to continue the tradition of the Prime business for the

next generation of their family.  Negotiations continued until May 31, 2007, when the third and

final LOI outlining the terms of the 2007 Transaction involving Meriturn and Prime Maine was

executed.  Trustee's Trial Exhibit 33.  Prior to the signing of this LOI, Franklin Staley, a senior

professional at Meriturn, provided Prime Maine with the financial model prepared by Meriturn

containing performance projections for Irving Tanning, Prime Maine and Prime Missouri. Mr.

Kehaya testified that Meriturn referred to these projections as "Project Football". Project

Football was memorialized in several exhibits which indicated a detailed evaluation by Meriturn

of such things as the projected value of the new company under a variety of scenarios. Trustee's

Trial Exhibit 27.  Some of the Defendants believed that these projections were optimistic and

might be difficult to achieve.  As to the design, financing, and structure of the terms of the 2007

Transaction, Mitchell Arden (an employee of Phoenix[2]), Stephen Kaplan, Michael Kaplan, Mr.

Moore, and Mr. Goldberg testified that they had little involvement and that these aspects of the

transaction were controlled and supervised entirely by Meriturn representatives.  In fact, the

Defendants contended that all of their actions with respect to the 2007 Transaction were taken

under the explicit direction and control of Meriturn representatives Mr. Kehaya, Mr. Staley and

Lee Hansen.  Third Party Complaint, ¶¶ 21, 22, 26 and 27.

The May 31, 2007 LOI provided that all of the assets, working capital, and business

associated with Prime Maine would be merged with Irving Tanning into Prime Delaware, which

would be owned 40% by the Shareholder Defendants and 60% by Meriturn.   As consideration

for this, Meriturn, subject to modification based upon a mid-year balance sheet, would:

> Contribute $15 million in cash (part of which would be structured as non-compete
> agreements with Michael Kaplan and Stephen Kaplan) to the Shareholder Defendants, $3
> million capital investment in the new company and the new company would issue a $3
> million seller's note to the Shareholder Defendants on a pari passu basis, and a $3 million
> earn-out agreement for the Shareholder Defendants;

> Assume Prime Maine's existing liabilities at the closing (estimated at $7.2 million as of
> April 5, 2007); and

> Exclude Prime Maine's interests in the value of certain life insurance policies maintained
> with respect to Stephen Kaplan, Michael Kaplan, Marjory Kaplan and Leonard Kaplan
> (estimated at $9 million).

Following the execution of the May 31, 2007 LOI, Meriturn and Prime Maine began their

due diligence. Prime Maine conducted monthly management meetings and monthly board

---

[2]   In addition to its work in connection with the Phoenix Report, Phoenix also assisted Prime Maine during the due
diligence process.

meetings where the company's officers and managers discussed the proposed deal. It also sought and received legal and accounting advice as to the transaction. Mitchell Arden and Norman Spector coordinated the due diligence efforts on behalf of Prime Maine. Mr. Arden admitted that the levels of due diligence were not equal but it seemed sensible to him that Meriturn dove deeper into the financial diligence than did Prime Maine, because Meriturn was investing in the transaction and Prime Maine's focus at that juncture was to make sure that there was enough money coming in to fund the transaction. The result of Prime Maine's analysis and due diligence was a report prepared by Phoenix and Prime Maine.  Trustee's Trial Exhibit 42.  On the Meriturn side of the equation, Mr. Kehaya testified that the purpose of the due diligence was to make sure that the assumptions that Meriturn made supporting their letter of intent were accurate. Meriturn hired Grant Thornton, an audit firm, to conduct the due diligence accounting work.  Grant Thornton produced a consolidated balance sheet showing the value of Prime Maine as of the closing date (Defendants' Trial Exhibit 41[3]) with retained earnings in excess of $45 million. The due diligence process was thorough and no request by Meriturn or Grant Thornton for information was ever refused.

As a result of each party's analysis, the deal outlined in the May 31, 2007 LOI proceeded forward and various agreements memorializing it were executed. Prime Maine, the Shareholder Defendants, Prime Delaware, and Irving Acquisition, Inc. (Prime Delaware's parent company) entered into a contribution agreement dated August 15, 2007 (the "Prime Contribution Agreement") (Trustee's Trial Exhibit 53).  That agreement provided that in return for the delivery of the Shareholder Defendants' shares of Prime Maine to Prime Delaware, Prime

---

[3] This exhibit is a one-page document entitled "PRIME TANNING CO., INC. and SUBSIDIARY Consolidated Balance Sheets November 20, 2007".  Although Mr. Kehaya testified that he was not certain that Exhibit 41 was prepared by Grant Thornton, he testified that it was more likely than not that it was.

Delaware would (a) pay them $11 million (subject to adjustment depending upon the final net worth of Prime Maine), (b) pay $4 million to Michael Kaplan and Stephen Kaplan for their agreement not to compete with the resulting business, (c) deliver a $3 million note to the Shareholder Defendants, (d) agree to an "earn out" arrangement entitling the Shareholder Defendants to an additional $3 million over time, and (e) issue forty percent of its shares to the Shareholder Defendants.   Irving Tanning, the Shareholder Defendants, Prime Delaware, and Irving Acquisition likewise entered into a contribution agreement dated August 15, 2007 (the "Irving Contribution Agreement") (Trustee's Trial Exhibit 196) which provided that in return for the delivery of the Irving Acquisition shares of Irving Tanning to Prime Delaware, Prime Delaware would issue (a) sixty percent of its shares to Irving Acquisition, and (b) a $3 million promissory note to Irving Acquisition.

As the closing date approached, and after the parties had entered into the contribution agreements, Meriturn decided to include the acquisition of another business, Cudahy, in the deal. The Defendants knew little or nothing about Cudahy's involvement in the 2007 Transaction, which Meriturn hoped would achieve additional economies of scale for the finishing operations and strengthen the new business.  Meriturn structured the 2007 Transaction so that Irving Tanning, Prime Maine, and Cudahy would come under the common ownership of Prime Delaware.

In order to finance the 2007 Transaction, Meriturn used the services of Wells Fargo. With the cooperation of Prime Maine, Wells Fargo undertook a full credit review of the transaction in October of 2007 and determined that Meriturn made a credible case that the venture resulting from the merger would be a success.  Meriturn had some concerns as to whether it would have enough money under the Wells Fargo financing to fund the operations of

Prime Delaware on the first day after the closing.  In the week prior to the closing of the 2007

Transaction, Prime Maine, at Meriturn's request, deferred payment of more than $1 million of

checks payable to Prime Maine's trade vendors in order to accommodate the financing terms

imposed by Wells Fargo.  On the date of the closing of the 2007 Transaction, Prime Maine owed

approximately $4 million in outstanding checks to its vendors.

Despite concerns about post-closing liquidity, the transaction closed on November 20,

2007.  It was a complicated deal with many pieces.  Irving Tanning, Prime Delaware, Cudahy,

Prime Maine, and Prime Missouri entered into certain financing transactions with Wells Fargo

and they delivered the following to the bank:

> A $1,860,000 term note, executed by Irving Tanning, Prime Delaware, Prime
> Maine, Cudahy, and Prime Missouri;
>
> A $40,000,000 revolving note, executed by Irving Tanning, Prime Delaware,
> Prime Maine, Cudahy, and Prime Missouri;
>
> A $25,000,000 revolving note, executed by Irving Tanning, Prime Delaware,
> Prime Maine, Cudahy, and Prime Missouri; and
>
> An amended and restated credit and security agreement by and between Irving
> Tanning, Prime Delaware, Prime Maine, Cudahy, Prime Missouri, and Wells
> Fargo (collectively, the "Wells Fargo Loans").

The obligations to Wells Fargo were secured by certain real estate and personal property owned

by various Debtors.  The amount actually borrowed by the Debtors from Wells Fargo at the time

of the 2007 Transaction was $1,656,785 under the term note and $28,165,000 under the

revolving notes.

At the closing and in accordance with the deal outlined in the May 31, 2007 LOI:

> Irving Tanning, Prime Delaware, Prime Maine, Cudahy, and Prime Missouri
> directed Wells Fargo to pay the Shareholder Defendants $10,629,459;
>
> Irving Tanning, Prime Delaware, Prime Maine, Cudahy, and Prime Missouri
> directed Wells Fargo to pay Michael Kaplan and Stephen Kaplan the $4 million

non-competition payment (the $10,629,459 and $4 million payments are referred to as the "Cash Proceeds");

Prime Delaware delivered a promissory note payable to the Shareholder Defendants in the principal amount of $3,817,000;

Prime Delaware issued forty percent of its shares to the Shareholder Defendants;

Prime Maine delivered the cash value of certain life insurance policies of approximately $9 million to Michael Kaplan, Stephen Kaplan, Marjory Kaplan and the Estate of Leonard Kaplan (the "Life Insurance Proceeds"); and

Prime Delaware entered into employment agreements with Michael Kaplan and Stephen Kaplan.

For the next several months, Prime Delaware was able to operate and pay its bills in the normal course, although financial problems arose.  In the first week of January 2008, Prime Delaware's accounts were overdrawn by about $1 million. Wells Fargo covered this shortfall through its financing arrangement with Prime Delaware, charging a forbearance fee of $50,000. Also, Prime Delaware was in violation of its earnings covenant under the Wells Fargo Loans beginning January 1, 2008, and was charged a default rate of interest starting in April 2008.  By July of 2008, the global recession hit with full force and Prime Delaware was no longer able to pay its bills as they became due.  The end of normal operations inexorably followed.

By early 2010, Prime Delaware was seriously insolvent and the majority and minority shareholders decided to go their separate ways.  The Shareholder Defendants, Prime Delaware, Prime Maine, Prime Missouri, Irving Tanning, Cudahy, Meriturn, Mr. Kehaya, and Mr. Spector, in his capacity as Shareholder Defendants' agent, entered into the 2010 Release.  The 2010 Release purported to discharge the Shareholder Defendants from the types of claims asserted by the Trustee in the Complaint.  In exchange, the Shareholder Defendants relinquished the consideration transferred to them under the Contribution Agreement (comprised of 40% of the shares of Prime Delaware), cancelled Prime Delaware's 2007 $3,817,000 promissory note to

them and absolved Prime Delaware of its obligations under the Non-Competition Agreements and the Employment Agreements with Stephen Kaplan and Michael Kaplan.  At that time, not only were Prime Delaware and its subsidiaries insolvent, but the value of Prime Delaware's stock was zero and it had little or no ability to fulfill any further financial obligations to the Shareholder Defendants, at least for the foreseeable future.  At around the same time, The Fund of Jupiter, LLC, a company controlled by Mr. Kehaya, loaned Prime Delaware $2.5 million for working capital.

These efforts did not save the companies.  On November 16, 2010, Irving Tanning, Prime Maine and Prime Missouri filed voluntary cases under chapter 11 of the Bankruptcy Code. On December 30, 2010, Prime Delaware, Cudahy, and Wismo followed suit.

## III. Jurisdiction and Venue.

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b), Article IX of the Plan, and the parties' explicit consent.  Wellness Int'l Network, Ltd. v. Sharif, ––– U.S. ––––, 135 S.Ct. 1932, 1949, 191 L.Ed.2d 911 (2015) ("The Court holds that Article III permits bankruptcy courts to decide Stern claims submitted to them by consent."). This adversary proceeding was referred to this Court pursuant to 28 U.S.C. §157(a) and D. Me. L.R. 83.6 and is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C.§ 1409(a).

## IV.  Analysis.[4]

Not surprisingly, the parties view the facts of this case very differently.  The Trustee sees

a story of actual fraud, constructive fraud and fiduciary breaches by the former owners and

insiders of Prime Maine.  It seeks relief under the Maine version of the Uniform Fraudulent

Transfers Act and the Maine Business Corporation Act.  The Defendants demur; they say the

facts show that global market changes, including a recession, thwarted their efforts to preserve a

family business.  Considering the facts and applying the relevant law (including the burdens of

proof), I conclude that the Defendants' interpretation of the events is more accurate.

### A.    Actual Fraud – Cash Transfers and Life Insurance Proceeds[5] (Counts I and IV) and the 2010 Release (Counts VII and X).

The Trustee accuses the Shareholder Defendants of engaging in two instances of actual

fraud: those relating to the Cash Transfers and Life Insurance Proceeds (Counts I and IV), and

those connected to the 2010 Release (Counts VII and X).  Specifically with respect to the Cash

Transfers and Life Insurance Proceeds, the Trustee alleges that the Shareholder Defendants, as

---

[4] The Defendants urged me to deny the Trustee's fraudulent transfers claims asserted in Counts I through VI of the Complaint pursuant to 11 U.S.C. § 546(e).  Given my determination that the Trustee is not entitled to the relief it seeks on these counts, I see no need to weigh in on the applicability of the § 546(e) "safe harbor" to these facts and to the state law claims raised by the Trustee.

[5] Counts I and IV of the Complaint did not originally include the Life Insurance Proceeds (an additional $9 million above the $14.6 million of Cash Transfers) within the allegedly fraudulent transfers but at the close of trial, the Trustee moved to amend the Complaint to include them in order to conform to the evidence.  The Shareholder Defendants objected, contending that allowing the amendment at such a late date would prejudice them.  I disagree and grant the Trustee's request.  The existence of the Life Insurance Proceeds and the fact that they would be transferred to Michael Kaplan, Stephen Kaplan, Marjory Kaplan and the Estate of Leonard Kaplan as part of the consideration for the transfer of the Prime Maine shares have been known to the Defendants from the time of the May 31, 2007  LOI.  The Complaint (¶¶ 47, 72) made it clear that it included the insurance proceeds in its calculation of the consideration the Shareholder Defendants received in the 2007 Transaction.  This was also apparent at trial.  The Defendants had fair notice of the Trustee's inclusion of this additional consideration, they had opportunities to contest it, and I conclude that they impliedly consented to its inclusion at trial.  See, House of Flavors, Inc. v. TFG Michigan, L.P., 643 F.3d 35, 41 (1st Cir. 2011);  In re Byers, 304 B.R. 1, 7 (B.A.P. 1st Cir. 2004)

13

controlling insiders of Prime Maine, foresaw that the 2007 Transaction would cause the Debtors

to become highly leveraged and overburdened by the Wells Fargo Loans.  It also claims that the

Shareholder Defendants intended to receive the Cash Transfers and Life Insurance Proceeds

(with a combined value in excess of $23.6 million) in exchange for valueless consideration,

which ultimately rendered the Debtors insolvent and hindered, delayed and defrauded its

creditors.  Likewise, the Shareholder Defendants knew that the value of the consideration

received by the Debtors from the Shareholder Defendants by the 2010 Release (the

relinquishment of consideration owed to them under the Prime and Irving Contribution

Agreements) was not reasonably equivalent to the value of the claims the Debtors had against

them arising from the 2007 Transaction.

These counts allege actual fraudulent intent and are based upon the provisions of  14

M.R.S.A. § 3575(1)(A), which provides that a "transfer made or obligation incurred by a debtor is

fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation [. . .

][w]ith  actual intent to hinder, delay or defraud any creditor of the debtor."  In order to prove

actual fraud, the burden of proof rests with the Trustee to show by clear and convincing evidence

that the Shareholder Defendants actually intended to hinder, delay or defraud creditors.

Mitsubishi Caterpillar Forklift America, Inc. v. Superior Service Associates, Inc., 81 F. Supp. 2d

101, 114 (D.Me. 1999);  In re Maine Poly, Inc., 317 B.R. 1, 8 (Bankr. D. Me. 2004).   "[W]hen a

claim is premised on fraud—and claims for intentional fraudulent transfer are in this category—

Fed. R. Civ. P. 9(b), which imposes a heightened pleading requirement, applies."  Weisfelner v.

Hofmann (In re Lyondell Chem. Co.), 541 B.R. 172, 181 (Bankr. S.D.N.Y. 2015)(rev'd on other

grounds, 2016 WL 4030937 (S.D.N.Y. 2016)).  It is not easy to prove "actual intent to hinder,

delay or defraud creditors" on direct evidence .  Max Sugarman Funeral Home, Inc. v. A.D.B.

Investors, 926 F.2d 1248, 1254 (1st Cir. 1991), and that was so at this trial given that the Trustee

adduced no direct evidence of fraudulent intent.  Michael Kaplan, Mr. Goldberg, Mr. Moore, and

Mr. Pombo testified persuasively that they did not have any intent to hinder, delay or defraud any

creditor of Prime Maine either in connection with the 2007 Transaction or the 2010 Release.

The Trustee was unable to establish otherwise.  Moreover, the Trustee's witness, Grover Elliott,

conceded that he did not know of any direct evidence which would show that any of the

Defendants had such actual fraudulent intent.

But the inquiry into actual fraud does not end here, as fraudulent intent is often inferred

"from the circumstances surrounding the transfer." Id.  "In determining whether the

circumstantial evidence supports an inference of fraudulent intent, courts should look to the

existence of certain badges of fraud." In re Maine Poly, Inc., 317 B.R. at 7 citing Dionne v.

Keating (In re XYZ Options, Inc.), 154 F.3d 1262, 1271 (11th Cir. 1998).  Maine's Uniform

Fraudulent Transfer Act lists eleven non-exclusive factors to consider when determining

whether actual intent to defraud is present.  14 M.R.S.A. § 3575(2)(A)-(K).  They are:

A.    The transfer or obligation was to an insider;

B.    The debtor retained possession or control of the property transferred
after the transfer;

C.    The transfer or obligation was disclosed or concealed;

D.    Before the transfer was made or obligation was incurred, the debtor sued or
threatened with suit;

E.    The transfer was of substantially all the debtor's assets;

F.    The debtor absconded;

G.    The debtor removed or concealed assets;

H.    The value of the consideration received by the debtor was [not] reasonably
equivalent to the value of the asset transferred or the amount of the obligation

incurred;

I.       The debtor was insolvent or became insolvent shortly after the transfer was made
         or the obligation was incurred;

J.       The transfer occurred shortly before or shortly after a substantial debt was
         incurred; and

K.       The debtor transferred the essential assets of the business to a lienor who had
         transferred the assets to an insider of the debtor.

Finally, the court should take a holistic view and take into account all evidence that supports

or undermines a finding of fraud.   See F.D.I.C. v. Proia, 663 A.2d 1252, 1254 (Me. 1995)

citing to Commissioners' Comment 6 to Section 4 of the Editor's Notes to the Uniform

Fraudulent Conveyance Act.   See also, Comment 4 to Maine's version of the Uniform

Fraudulent Transfer Act.

### 1.  The 2007 Transaction.

Applying this framework to the facts and testimony presented at trial, I do not find actual

fraud.  Although there is evidence of two of the factors listed in 14 M.R.S.A. §3575, namely

that transfers were made to insiders (the Cash Transfers and Life Insurance Proceeds were

transferred to the Shareholder Defendants) and the 2007 Transaction effectuated the transfer of

substantially all of the Prime Maine's assets, none of the other badges of fraud were established

or proven at trial.  No evidence was presented to support a finding that the transfer was

concealed or that anyone removed, concealed, or absconded with the assets of the Debtors.

Although the Trustee focused on two key indicia of fraud (whether the value of the Prime

Maine shares was reasonably equivalent to the Cash Transfers and whether the 2007

Transaction left the Debtors insolvent or at least well on their way to insolvency), for the

reasons discussed below in Part B, I conclude that it did not successfully establish either.

The uncontroverted testimony of Stephen Kaplan, Michael Kaplan, Mr. Goldberg, Mr.

Moore, Mr. Pombo, and Mr. Kehaya described an arms' length deal between unrelated and

sophisticated parties who had their own motives to ensure that the resulting business, Prime

Delaware, was a success.[6]  This was not an interfamily transfer whereby the Kaplans could,

without any oversight, mastermind a deal in which they could extract equity from Prime Maine

at the expense of future creditors.  The testimony of Mr. Moore, Mr. Kehaya, and Mr. Arden,

painted a picture of a detailed and extensively researched plan, supported by legal and financial

consultants, to merge companies and to (hopefully) create a profitable business.  Specifically,

the witnesses testified about considerable due diligence efforts by Meriturn.  In addition to

having its own representatives examine the transaction and the future projections of the merged

companies, Meriturn hired Grant Thornton to do the same.  Wells Fargo, as the financier,

undertook its own detailed efforts to ensure that its asset-based loan to the new entity would

succeed.  The testimony of the witnesses was unwavering: Prime Maine's representatives fully

cooperated with Meriturn, Grant Thornton, Wells Fargo and others in the due diligence process.

Finally, Stephen Kaplan, Michael Kaplan, Mr. Moore, Mr. Goldberg, and Mr. Pombo all

testified that the merger had the potential to create efficiencies, expand markets, lessen costs

and allow the Kaplan family to continue its connection with the Prime brand into another

generation. The evidence simply does not support a finding that the Shareholder Defendants

were seeking to cash out and run.  Their earlier rejection of the first LOI, which would have

---

[6] In the Third Circuit, this alone might prove fatal to the Trustee's claim.  "[T]he mere expectation that the fusion of
two companies would produce a strong synergy (an expectation that turned out to be inaccurate in hindsight) would
suffice to confer "value" so long as the expectation was "*legitimate and reasonable.*" . . . .  Thus, so long as there is
some chance that a contemplated investment will generate a positive return at the time of the disputed transfer, we
will find that value has been conferred.  Mellon Bank v. Official Committee of Unsecured Creditors (In re R.M.L.,
Inc.), 92 F.3d 139, 152 (3d Cir. 1996), quoting Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635
(3d Cir.1991), cert. denied, 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992).

accomplished that very goal, directly refutes that.  Therefore I find that the Trustee did not

satisfy its burden of proving, by clear and convincing evidence, the required elements of actual

fraud against the Shareholder Defendants regarding the Cash Transfers and Life Insurance

Proceeds.

### 2.  The 2010 Release.

My analysis of the 2010 Release mirrors that of the 2007 Transaction. First, the Trustee

did not adduce any direct evidence of actual fraud as respects this release. Stephen Kaplan,

Michael Kaplan, Mr. Goldberg, Mr. Moore and Mr. Pombo provided uncontroverted testimony

that none of the Shareholder Defendants intended to hinder, delay or defraud any creditors of

the Debtors. Second, when I weigh all of the circumstantial evidence presented in connection

with the 2010 Release, I do not find that the Trustee met its burden of establishing fraud by

clear and convincing evidence.  In exchange for the 2010 Release of all claims, including those

which any of the Debtors may have had against the Shareholder Defendants based on the 2007

Transaction, the Shareholder Defendants transferred their 40% ownership of Prime Delaware to

Prime Delaware and gave up any claims to recover consideration due to them under the Irving

Contribution Agreement or the Prime Contribution Agreement (such as the money owed to

them by virtue of the $3 million promissory note, the non-compete agreements, the

employment agreements and the earn outs).  Even if, as the Trustee asserts, the Debtors had no

ability to pay the Shareholder Defendants under the contribution agreements, I have just

determined that the causes of action against the Shareholder Defendants arising from the 2007

Transaction have no value and therefore the Trustee cannot show that the value exchanged was

not reasonably equivalent.

As such, the Trustee did not satisfy its burden of proving, by clear and convincing evidence, the required elements of actual fraud against the Shareholder Defendants and judgment on Counts I, IV, VII and X shall enter in favor of the Shareholder Defendants.

### B.  Constructive Fraud – Counts II, III, V, VI, VIII, IX, XI and XII.

In addition to allegations of actual fraud, the Trustee maintains that the Shareholder Defendants engaged in constructive fraud in two aspects: conduct in connection with the Cash Transfers and Life Insurance Proceeds[7] (Counts II, III, V and VI) and with the 2010 Release (Counts VIII, IX, XI and XII). As the party seeking to avoid these transfers, the burden of proof is on the Trustee.  See In re Maine Poly, Inc., 317 B.R. at 7. In order to prevail on any of the constructive fraud claims, the Trustee must first prove, by a preponderance of the evidence, that the transfers were made [w]ithout receiving a reasonably equivalent  value in exchange for the transfer or obligations." 14 M.R.S.A. § 3575(1)(B); In re Maine Poly, Inc., 317 B.R. at 8 (quotations omitted).   If it is successful, it must then show that the debtor "(1) [w]as engaged or was about to engage in a business or a transaction for which  the remaining assets of the debtor were unreasonably small in relation to the  business or transaction; or (2) [i]ntended to incur, or believed or reasonably should have believed that . . . [it] would incur, debts beyond ... [its] ability to pay as the debts became due."  14 M.R.S.A. § 3575(1)(B).

### 1.  The 2007 Transaction.

Turning first to the "reasonably equivalent value" threshold, even though the Maine Supreme Judicial Court has not had the occasion to define "reasonably equivalent value", cases

---

[7] The constructive fraud counts of the Complaint relating to the Cash Transfers (Counts II, III, V and VI) did not originally include the Life Insurance Proceeds (an additional $9 million above the $14.6 million of Cash Transfers) within the allegedly constructively fraudulent transfers but for the reasons set forth in footnote 5, I include those additional proceeds in these counts.

construing the same phrase in the context of 11 U.S.C. § 548 provide guidance.  In re Sergio, 62

Bankr. Ct. Dec. 199, 2016 WL 3480835, at *6 (Bankr. D. Mass. June 20, 2016).

> The Bankruptcy Code provides no definition to guide this Court in the application of the term "reasonably equivalent value." However, courts have uniformly held that a reasonably equivalent value determination should be based on all of the facts and circumstances of the case [. . . ]  The Court should "compare what was given with what was received." . . . And, in making this determination, both direct and indirect benefits should be considered [. . .] It is not necessary that there be an exact exchange in order to establish reasonably equivalent value, but the Court "must keep the equitable purposes of the statute firmly in mind, recognizing that any significant disparity between the value received and the obligation assumed [. . .] will have significantly harmed [. . . ] innocent creditors."

In re Tri-Star Techs. Co., Inc., 260 B.R. 319, 325-26 (Bankr. D. Mass. 2001) (footnotes and internal citations omitted); See also, In re Sergio, 2016 WL 3480835, at *6.

There is no dispute that in consideration of the transfer of 100% of the shares of Prime

Maine, the Shareholder Defendants received approximately $23.6 million at the closing in the

form of the Cash Proceeds ($14.6 million) and the Insurance Proceeds (approximately $9

million), and 40% of Prime Delaware.  The parties disagree about the value of this consideration.

The Trustee maintains that Prime Maine was worthless at closing.  Its primary witness, Mr.

Elliot, was Prime Delaware's post-closing vice president of finance and its CFO.  He also served

as the responsible officer for each of the Debtors during their bankruptcies.  He testified that as

of the date of the closing, Prime Maine was experiencing a liquidity crisis because it did not have

sufficient funds to pay its bills after factoring in the $4 million of outstanding checks and the

$1.2 million of checks which were held back at closing. He also said that he performed his own

valuation of the business based upon the circumstances at the closing and concluded that the

"fair valuation" of Prime Maine as of the closing date was zero.  The strength of this testimony

was eroded by his concession that he never put the valuation in writing and that his method of

calculation was not in accord with generally accepted accounting principles ("GAAP").

The Defendants disagreed with him and offered multiple ways to value Prime Maine as

of the closing, all of which support a finding that the Shareholder Defendants exchanged

reasonably equivalent value in return for the $23.6 million they received.   First, they presented

an audited financial statement by Schneider, Schneider and Associates for Prime Maine and

Prime Missouri for the years ending June 30, 2007 and June 24, 2006 (Defendants' Trial Exhibit

13), which established retained earnings in excess of $45 million.   Mr. Elliott did not challenge

the accuracy of this valuation, as it was conducted in accordance with GAAP.   Nor did he offer

any basis to question the upward adjustment of the value of Prime Maine by the closing, by over

$671,000 as anticipated by the May 31, 2007 LOI and as memorialized in the First Amendment

to the Contribution Agreements (Trustee's Trial Exhibit 124).   Using the $45 million value, the

amount of retained earnings transferred by the Shareholder Defendants at the closing in return

for the $23.6 million mentioned above was in excess of $27 million.[8]   Second, the Defendants

offered Prime Delaware's federal tax return for the tax year beginning on November 21, 2007

(the day after the closing) and ending on June 28, 2008, prepared by Grant Thornton

(Defendants' Trial Exhibit 17).   The return was signed under penalties of perjury by Donald

Briggs, the treasurer of Prime Delaware, who reported to Mr. Elliott, and showed that the

retained earnings of Prime Delaware (along with its subsidiaries, Prime Maine, Prime Missouri,

Irving Tanning, and Cudahy) as of November 21, 2007 were in excess of $46 million

(Defendants' Trial Exhibit 17, See page 4, line 25 of Form 1120).   Mr. Elliott confirmed that he

reviewed the return prior to its filing and, given his long career in finance, he understood the

importance of ensuring the accuracy of tax returns. He conceded that the $46 million figure was

---

[8] The Shareholder Defendants received a 40% ownership in the new company, Prime Delaware, so the $45 million figure needs to be reduced by that percentage ($45 million minus $18 million (Shareholder Defendants' 40% of New Prime) equals $27 million).

accurate and represented the retained earnings figure for Prime Maine and Prime Missouri and did not include any values for the retained earnings for Irving Tanning or Cudahy.  Using this figure as the value of Prime Maine, the amount of retained earnings transferred by the Shareholder Defendants at the closing in return for the $23.6 million mentioned above were in excess of $27.6 million applying a similar calculation as used in Footnote 8.  Third, the Defendants noted that the consolidated balance sheets for Prime Maine and Prime Missouri as of the closing date (Defendants' Trial Exhibits 40 and 41) reported total equity of $23,985,180 and retained earnings greater than $44 million.[9]  Under both of these figures, the 2007 Transfer amounted to a reasonably equivalent exchange of consideration.

These values, which establish that the net equity or the retained earnings of Prime Maine as of the closing date were all reasonably equivalent to the $23.6 million the Shareholder Defendants received from the 2007 Transaction, were bolstered by the testimony of the Defendants, including Stephen Kaplan and Michael Kaplan, and the Defendants' expert witness, Carl Jenkins.  Mr. Jenkins examined Prime Delaware's balance sheet, utilizing the GAAP Balance Sheet Approach[10], and concluded that, after consideration of closing costs and payments to the Shareholder Defendants, Prime Delaware had a resulting net worth of $24 million as of the closing date (Defendants' Trial Exhibit 84, pages 12-13).  In reaching this conclusion, he observed that approximately 70% of Prime Delaware's then current assets were not "written down" in the audited financials and that one of Prime Delaware's assets, the Prime Missouri

---

[9] Mr. Elliot could not recall for certain whether Grant Thornton prepared both of them, though he thought that Exhibit 41 could have been prepared by Grant Thornton, and he testified that both were prepared for the closing.

[10] According to Mr. Jenkins' expert witness report (Defendants' Trial Exhibit 84, page 11), this approach "evaluates the net worth of the company based on a direct comparison of assets to liabilities. The individual asset accounts on the subject company's balance sheet are added together and in the company's liabilities, at their stated (or expected value where appropriate) amounts, are subtracted."

facility, was sold a year and a half after the closing date, during the recession, for $10.4 million, nearly double the value assigned to it as of the closing date.  Id. [11]

I am persuaded by the depth of the testimony and evidence presented by the Defendants as to the value of the consideration the Shareholder Defendants exchanged for the Cash Transfers and the Life Insurance Proceeds, when compared to that offered by the Trustee, that the Trustee failed to satisfy its burden that the consideration exchanged was not reasonably equivalent. Judgment for the Defendants shall enter on Counts II, III, V and VI.

### 2. The 2010 Release.

Just as I concluded above that the procurement of the 2010 Release was not the result of actual fraudulent conduct by the Shareholder Defendants, I reach the same result when I evaluate whether the Shareholder Defendants engaged in constructively fraudulent in connection with the release.  The Trustee did not meet its burden of proving that equivalent value was not exchanged in the release – the value of the Shareholder Defendants' interests in Prime Delaware by virtue of their stock interest and the note ($0) was the same as the claims surrendered by Prime Maine's

---

[11] Although I need go no further because I have determined that the Trustee failed to satisfy the crucial first element of a successful constructive fraud claim, I note that the testimony of several Defendants and Mr. Jenkins support a finding that the Trustee was not able to satisfy the other elements of constructive fraud claims because at the time of the closing, Prime Delaware had sufficient assets in relation to the business it was engaged and the Defendants were reasonable in their belief that following the closing Prime Delaware would be able to pay its bills as they came due. Although at closing there were deferred payments of $1 million and $4 million of outstanding checks, the former occurred as Prime Delaware switched banks to Wells Fargo and the latter was, as Mr. Arden testified, not unusual for a company of Prime Delaware's size.  Further, Prime Delaware was able to pay its creditors as the bills came due up through early to mid-2008 and for some courts, this alone would be sufficient to conclude that the Trustee's constructive fraud claims must fail.  In re Joy Recovery Tech. Corp., 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002) (collecting cases).   Although by 2009, Prime Delaware was unable to pay its vendors on a current basis and was forced to convert $8.7 million in accounts payable to vendor notes payable, the Trustee was not able to convincingly link those facts with the 2007 payments to the Shareholder Defendants.  A more likely culprit was the unforeseen, intervening, and devastating impact of the recession of late 2007 through 2009, about which several Defendants testified and of which I can take judicial notice.  See Eclectic Properties E., LLC v. Marcus & Millichap Co., 751 F.3d 990, 999, n. 6 (9th Cir. 2014); West Coast Hotel Co. v. Parrish, 300 U.S. 379, 399, 57 S. Ct. 578, 585, 81 L. Ed. 703 (1937) ("We may take judicial notice of the unparalleled demands for relief which arose during the recent period of depression and still continue to an alarming extent despite the degree of economic recovery which has been achieved.").

majority shareholders (also $0).

### C. Breaches of Fiduciary Duties of Care and Loyalty - Counts XIII-XIV.

The Trustee's final two counts are against the Director Defendants. The Maine

Business Corporations Act mandates that members of the board of directors must act in good

faith and in the manner that the directors reasonably believe to be in the best interests of the

corporation.  13-C M.R.S.A. §831(1).   They must also "discharge their duties with the care

that a person in a like position would reasonably believe appropriate under similar

circumstances".  13-C M.R.S.A. §831(2).  The Trustee asserts that the Director Defendants

breached their duties of care and loyalty by authorizing the 2007 Transaction.   However,

because I have ruled against the Trustee on all other counts, these two cannot prevail.  If the

Shareholder Defendants' actions in connection with the 2007 Transaction did not constitute

actual or constructive fraudulent transfers, as I have concluded above, the Director Defendants

did not violate the fiduciary duties imposed upon them by 13-C M.R.S.A. §§831 and 832.

### V.  Conclusion.

For the reasons set forth above, I conclude that the Trustee has not met its burden of

proof on any of the 14 counts in the Complaint, and judgment shall enter in favor of the

Defendants.


Dated:  August 9, 2016                     /s/ Peter G. Cary
                                          Peter G. Cary, Chief Judge
                                          United States Bankruptcy Court